Brian J. Miller
Anne Sherwood
MORRISON SHERWOOD WILSON & DEOLA, PLLP
401 North Last Chance Gulch
P.O. Box 557
Helena, MT 59624-0557
406-442-3261 Phone
406-443-7294 Fax
bmiller@mswdlaw.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA, GREAT FALLS DIVISION

| | |
|---|---|
| MCKENZIE LYONS, on behalf of herself and all others similarly-situated,<br><br>    Plaintiff,<br><br> v.<br><br>CHIEF JEFF NEWTON, individually and in his official capacity a Chief of the Great Falls Police Department, OFFICER TRAVIS PALMER, individually and in his capacity as an Officer of the Great Falls Police Department, CITY OF GREAT FALLS, MONTANA, by and through the City of Great Falls Police Department, and John Does 1-10,<br><br>    Defendants. | Case No. CV-21-121-GF-BMM<br><br><br>**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL AND INJUNCTIVE AND RELIEF** |

## I. Introductory narrative statement of facts

1. Plaintiff McKenzie Lyons and defendant Travis Palmer were both working as police officers at the Great Falls Police Department when they started dating in August of 2020.

2. Within a relatively short time, Palmer became physically, mentally, and emotionally abusive towards Lyons.

3. Palmer had over 20 years on the force and held a position of power and influence within the GFPD and had a private business relationship with Chief of Police Jeff Newton outside of work.  This power dynamic put Lyons in a tricky position when it came time to end her romantic relationship with Palmer.

4. Complicating Lyons' situation was the existence of a custom and usage of pervasive and pernicious gender bias against women officers and victims of domestic violence among officers and the leadership team at the GFPD.  With respect to women officers, this custom and usage manifested in actions, statements, and conditions from Chief Jeff Newton, his leadership team, and other male officers in the force,  who viewed women officers as less capable of doing the hard work of policing than men, and treated them as less than capable as their male counterparts and requiring different treatment.  While not all of the male

officers on the force participated in this custom and usage, a sufficient number did to the point where this custom and usage operated to deny women on the force equal protection of the law and due process.

5. With respect to victims of domestic violence, this custom and usage took the form of an attitude which protected, excused and justified the abuser's conduct, shamed and blamed the victim, and denied victims of domestic violence the equal protection of the laws and due process. This custom and usage was fostered and encouraged by Chief Newton, some members of his leadership team, and individual officers such as Palmer.

6. Understanding that Palmer would use his leverage and power within the GFPD against her if she tried to leave, and even fearing that her superior officers would not take her allegations of domestic violence by Palmer seriously, Lyons was afraid to end the relationship and report the abuse for fear she would be retaliated against or lose her job.

7. Lyons attempted to break up with Palmer in the most respectful and diplomatic way possible, hoping to avoid the negative consequences that would likely follow when she ended the relationship. Lyons rightfully perceived that Palmer would use any means at his disposal to stop and punish her, and that Newton would give Palmer an assist by deploying

the power he held in his position as Chief of the GFPD against her as well; thus giving the custom and usage of gender bias against women and victims of domestic violence the full effect and force of law, transforming such conduct from merely private interactions into those performed under "color of law".

8. Lyons loved her job as a patrol officer and felt she was filling a vital need for female officers in the community of Great Falls. Of the approximately 88 sworn officers in the GFPD, there were only a handful of women officers patrolling the streets of Great Falls, and Lyons perceived that they were not given the respect they deserved and were being treated and viewed differently from the male officers based solely on their gender. Lyons has a master's degree in forensic psychology and was aware of the unique challenges that victims of domestic violence face in America today. She believed that more female street-level officers were needed and that she could make a difference in the lives of victims of domestic violence specifically, and in maintaining public order in general. She asked for no special favors or treatment and was able function at a level equal to or greater than her male counterparts.

9. When Palmer's mental and emotional instability became more and more apparent, and the level of domestic violence against her increased,

Lyons knew she had to end the relationship.  Palmer didn't take it well.

Palmer stalked Lyons, threatened suicide if she did not return to him,

and threatened violence against a friend of Lyons who also happens to

be a federal Customs and Border Patrol agent.

10.    Although Palmer was still having great difficulty accepting the end of

the relationship, for a brief period of time relations between Palmer and

Lyons seemed to be levelling out, and Lyons was hopeful that Palmer

would get the message, move on, find someone else, and just let her do

her job serving the citizens of Great Falls as a patrol officer.

11.    On October 5, 2021, Palmer's obsession with Lyons crossed the line,

forcing Lyons' hand and giving her no choice but to report him to her

superiors.  Lyons was on duty at the time, in uniform, and getting into

her patrol car at the Town Pump when Palmer approached her and

insisted that she marry him.  Lyons reiterated that their relationship was

over and that she did not want to speak with him, but Palmer prevented

her from leaving in her patrol car.  After several minutes, Lyons was able

to get Palmer to leave by telling him she had to go to court and that she

would call him when her court appearance had concluded.  Lyons was

deeply shaken by this incident, and worried that these types of

encounters would only get worse and create a dangerous situation for her in the future when she was on patrol in Great Falls.

12.    Because Palmer's conduct created a public safety risk and was likely to escalate in the future, Lyons had no choice but to report the incident, as well as stalking and privacy in communications violations, to her superior officer, Sgt. Bragg, of the GFPD.

13.    Lyons gave Sgt. Bragg more than sufficient evidence to arrest and charge Palmer with crimes related to domestic violence, including the offenses of stalking (in violation of Section 45-5-220, MCA), partner of family member assault (in violation of Section 45-5-209, MCA), and privacy in communications (in violation of Section 45-8-213, MCA). However, Sgt. Bragg, Chief Newton, and other members of Newton's leadership team, engaged in exactly the type of victim-shaming that Lyons had feared would happen, and was the sole reason why she failed to report the conduct earlier.  The reaction of Chief Newton and his leadership team to the substantial credible evidence of criminal wrongdoing by Palmer is compelling and direct evidence of the custom and usage of gender discrimination against women and victims of domestic violence that Lyons perceived during her time at GFPD.  They failed to take any steps to protect Lyons, or ensure that Palmer's

probable criminal conduct was adequately investigated and put to a stop, and in some respects aided and covered for Palmer's unlawful conduct to harm Lyons.

**14.**    Palmer was never placed on leave, and the GFPD failed to conduct a sufficient investigation, or refer the matter to an outside body for independent review.

**15.**    Newton and the GFPD did nothing to restrain or meaningfully investigate Palmer's conduct.  In fact, they did worse than nothing, because Newton and the GFPD allowed Palmer to remain on the force, providing him access to a wide range of surveillance tools and methods which he could use to continue stalking Lyons.

16.    And, in fact, that is precisely what Palmer did. On October 22, 2021, Lyons was conducting a traffic stop on 16th street south, between 11th avenue south and 10th avenue south.  Lyons had noticed a vehicle that she thought had been previously cited for registration violation.  The street on which Lyons stopped the vehicle was off any main thoroughfares.  As Lyons was out of her car interacting with the driver and obtaining his information, she scanned her immediate area as was her practice.  She immediately noticed Palmer's truck, driving slowly in her direction on 16th street south.  Palmer came within 20 feet of Lyons,

driving slowly, and made eye contact with her and smirked at her in a

menacing manner while she was in the middle of her stop.  This incident

shook Lyons to the core.  It showed that Palmer was likely using the

resources available to him as an officer of the GFPD to stalk her.  It also

created a dangerous situation, as traffic stops are one of the most

perilous types of situations for officers and requires them to maintain

clear and focused attention at all times in order to stay safe.  By allowing

Palmer to roam the streets, Chief Newton and his leadership team at

GFPD recklessly and wantonly put the safety of their fellow officer,

McKenize Lyons, at risk.

17.    Lyons reported the incident to Sgt. Bragg, who blew it off as a

coincidence.   When Lyons pointed out the circumstances indicating that

Palmer had intentionally followed her, Bragg had no meaningful reply

and refused to treat the matter with any seriousness or take any action

to stop it.

**18.**    In addition to aiding and abetting Palmer's likely criminal conduct,

Chief Newton and the GFPD subsequently retaliated against Lyons by

terminating her on November 9, 2021, for reporting Palmer's acts of

domestic violence.  No action was taken to address Palmer's probable

criminal conduct and the acts of domestic violence themselves.  This

action by Newton and the GFPD constitutes an egregious and shocking denial of equal protection and due process and was done pursuant to a custom and usage of pervasive gender bias against women officers and/or victims of domestic violence.   This action was done by Chief Newton and his leadership team under color of law.

19.    To this day, there has been no accountability for Palmer.  Palmer roams the streets of Great Falls as a fully armed patrol officer.  Palmer has access to powerful tools and means of surveillance through Newton and the GFPD.  By allowing Palmer to remain at large, Chief Newton and the GFPD are recklessly and knowingly creating an unreasonably dangerous condition for Lyons and her young daughter, as well as all other potential victims of domestic violence in the City of Great Falls. This situation is directly caused by the fact that Newton and GFPD are denying Lyons', and others similarly situated to her as victims of domestic violence, the equal protection of the laws and due process.

20.    Today, Lyons lives in a constant state of vigilance, caused by the reckless indifference of Palmer, Newton, and the GFPD, unsure if Palmer is watching her or not, waiting for him to show up on her doorstep at any time.  Lyons will be forced to remain in this state until

Palmer is off the streets, stripped of his access to firearms and police surveillance resources, and held to account for his probable crimes.

21.    This custom and usage of gender bias against women and victims of domestic violence was given the full force and effect of law (i.e., "color of law") through the concrete actions of Chief Newton and Officer Palmer in this case.  Ultimately, this custom and usage was the driving force behind Chief Newton's decision to ignore and cover up clear and convincing evidence of domestic violence by Palmer against Lyons, punish Lyons personally, and place Lyons and her daughter in a position of peril and risk.

22.    As a result, victims of domestic violence who may come into contact with Palmer if he responds to a call are also at a real risk of harm for denial of equal protection of the law and due process.  Given Palmer's conduct, and the appalling lack of accountability by Newton and the GFPD, it is reasonable to conclude that none of these victims will be afforded the equal protection of the law and due process if encountered by Palmer, since Palmer himself has likely committed these very offenses with impunity against Lyons and is being protected by Newton and the leadership team of the GFPD.

23.    Further discovery will likely reveal this custom and usage has effects on other cases of domestic violence, and/or former or current female officers within the GFPD. Lyons' case will not be the only situation in which a female was denied equal protection and due process of law under color of law by the GFPD.

24.    Based on these facts, Lyons files this complaint against the GFPD, Chief Jeff Newton, and Officer Travis Palmer in their official capacities, pursuant to 28 U.S.C. § 1983, for denial of equal protection and due process.  Lyons is also filing a claim of common law negligence against these Defendants, as well claims of intentional or negligent infliction of emotional distress against Newton and Palmer in their personal capacities as well.

25.    Lyons asks this Court for immediate injunctive relief to protect her from Palmer and Newton and is filing a separate motion and brief concurrently with the filing of this complaint to address that issue.

26.    Lyons will also be seeking status as a class representative for other women and/or victims of domestic violence who have been or will be denied equal protection and due process of law by the GFPD and/or Newton.   In her capacity as a class representative, Lyons hopes to obtain broader injunctive relief against the GFPD to ensure that no other

woman officer, or victim of domestic violence, is ever subjected to what she has had to endure at the hands of Chief Newton, Travis Palmer, and the GFPD.

## II. Jurisdictional Allegations

27.    Plaintiff McKenzie Lyons is a resident of Great Falls, Montana, Cascade County and a former officer with defendant City of Great Falls Police Department (GFPD).

28.    The City of Great Falls is a municipality located in Cascade County, State of Montana.  The City of Great Falls Police Department is an arm or division of the City of Great Falls.  The acts and omissions described in this complaint stem from conduct that occurred within the GFPD and its employees.

29.    Chief Jeff Newton is the current police Chief of the GFPD and a resident of Cascade County.  He is being sued in both his official capacity as the chief of the GFPD, and individually to the extent his actions give rise to personal, as opposed to municipal, liability.

30.    Officer Travis Palmer is an officer of the GFPD and a resident of Cascade County.  Palmer has been working at the GFPD since approximately November 2000. He is being sued in both his official

capacity as an officer with the GFPD, and individually to the extent his

actions give rise to personal, as opposed to municipal, liability.

31.    This Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. § 1331 and § 1343.

32.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b), and in

this division pursuant to Local Rules 1.2(c) and 3.2(b).

33.    This Court has the authority to grant declaratory and injunctive relief

pursuant to 28 U.S.C. § 1343, 2201, and 2202, and to award attorney

fees under 42 U.S.C. § 1988(b).

### III. Allegations concerning the inception of the relationship between Lyons and Palmer

34.    Lyons was hired as a Probationary Police Officer with the Great Falls

Police Department on September 8, 2020.

35.    Palmer was a master patrol officer with roughly 20 years of

experience at the time that Lyons joined the force.  Palmer had been

shot in the line of duty sometime in October 2003.  Upon information and

belief, Palmer suffered PTSD as a result of this incident, as well as other

adverse mental health consequences which persist to this day.  Upon

information and belief, Palmer may also be suffering from untreated

alcohol dependency issues.

36.    Lyons had been previously employed by Montana DOC - Probation and Parole. In December of 2018, she first met Officer Palmer while on a call during that time. After that, they formed a friendship and socialized outside of work.

37.    In late August of 2020, Officer Palmer reached out to Lyons and asked her if she would like to date him.  Lyons agreed to do so.

### IV. Allegations regarding emotional, mental, and physical abuse inflicted by Palmer against Lyons

38.    In October 2020 Lyons was in a serious accident in a side-by-side near Lincoln, MT. Lyons was severely injured and due to those injuries was dependent on physical care of both Palmer and her family.

39.    For reasons that were never clear to Lyons, Palmer quickly developed severe resentments against Lyons for having to care for her. He would repeatedly tell her that she "owed him" for taking care of her, and make statements comparing her trauma to the trauma he endured when he was shot.  From that point forward, the relationship between Palmer and Lyons became toxic.

40.    By Christmas of 2020, Palmer was becoming overtly abusive. For example, Palmer would often laugh at Lyons and make fun of her when she couldn't get her clothes on or able to fit them on her body (due to

her injuries she had severe burns on her torso, back, and leg). If there were moments when she would express discomfort or hurt feelings over something he did or said, he would often begin yelling at her, telling her she was crazy, telling her she was insecure and had trust issues and needed to "get her life together".

41.    During this time frame, Palmer began engaging in physical acts of domestic abuse against Lyons, including unlawful restraint and pushing. In one such incident, an argument between the parties got intense when Palmer grabbed Lyons and would not let her leave.  Ultimately, Lyons ended up laying on his couch with her arms over top her head and face crying "please don't hit me" and "why are you doing this to me" while Palmer stood over her screaming at her and would not let her move.

42.    In early January of 2021, Palmer was at Lyons' apartment and he barricaded her in her room. Lyons was yelling at Palmer to please let her out and Lyons tried to push past him to break free. Palmer used his body weight to block her in and the force bent back her wrist, which was still injured from her broken arm, causing severe pain to her wrist and arm.

43.    Palmer's abusive conduct continued unabated and included such conduct as threatening to call in welfare checks on Lyons, belittling her

and implying she was terrible mother, and telling her she was on probation and would lose her job.  This kind of toxic dynamic continued to worsen over time.

44.    In February of 2021, Lyons confronted Palmer when she learned he was unfaithful to her. Lyons had just had her second surgery and was in a full arm cast and was still dependent on him. Throughout that month, Palmer was increasingly volatile in his behavior and would throw shoes and clothes at Lyons when she would say she wanted her things and wanted to leave. Palmer would tell Lyons that all she did was abandon him when he needed help and he blamed her for his longstanding mental health issues.

45.    During this time, there was an incident when Palmer indicated he did not care if Lyons stayed or left, and went into his bedroom, took Lyons' suitcase, came out to his garage where Lyons was trying to get into her car, and threw the suitcase at Lyons, hitting her in the head/back.

46.    These incidents, and others, continued to worsen. Palmer was irrationally jealous and controlling.  For instance, Lyons was in a group chat with males from her academy class in order to coordinate times to meet to complete their course of study.  Palmer would accuse Lyons of laughing at the messages and not doing the same or showing the same

affection towards him. Palmer told Lyons she was not "allowed" to speak with them while home on the weekends if they would send any messages.

47.    Another example of Palmer's erratic and abusive behavior occurred in July of 2021 in Lincoln MT, when the parties were staying at Palmer's cabin. Palmer became enraged at Lyons for no reason, and began screaming at her, physically pushed her out of his cabin, throwing all of her items at her, and then locking her out of the cabin. Lyons had to drive back to Great Falls at 1 am in the morning.

48.    Another incident occurred around the first week of September 2021. Palmer and Lyons were in Lincoln, Montana and Palmer was being verbally abusive towards Lyons. Palmer would tell Lyons she was lazy, never "got off her ass" to help him, and similar abusive statements. Around 9 pm that evening, Lyons tried to get her daughter from the bedroom in order to leave as she had a feeling that Palmer was escalating.  Palmer stood over top Lyons and threatened that he would tell people Lyons was drunk and would call her in to the Montana Highway Patrol if she left and ruin her career.

49.    During the "explosive" incidents Lyons would endure with Palmer, he would tell her that he tells other people Lyons attacks and abuses him

and that she is the crazy one with the problem and no one would believe her. When Palmer would barricade Lyons, or hold her down, she would often try to push his body out of the way to escape.

50.    Throughout these incidents, Lyons would sometimes get free of him, sometimes for a few days, to a week and at one point Lyons even went 2 weeks without speaking/seeing him.  During this time, Palmer would often text Lyons asking her where she was and stating her car was not at home and that he knew her vehicle was not parked at her apartment, demanding that Lyons tell him where she was.

51.    Lyons is not alone in being victim of domestic violence who had great difficulty leaving her abuser. *See, "Why do victims stay?"*

*https://ncadv.org/why-do-victims-stay* (last accessed December 6, 2021).

## V. Allegations regarding the break-up of the relationship and the October 5, 2021 incident

52.    On September 18, 2021, Lyons caught Palmer being unfaithful a second time. They were in Lincoln, Montana at that time.  Lyons left Lincoln that day, and informed Palmer that the relationship was over and that she did not want him to contact her.  Palmer tried to get Lyons to stay in the relationship, but since Palmer's mother was there he did not

barricade Lyons or attempt to unlawfully restrain her, and she was able to finally leave.

53.     From that point forward, Palmer engaged in a series of actions that were intimidating, harassing, and stalking, and would likely constitute criminal offenses under Montana law. Sometimes, Palmer attempted to "play nice" with Lyons, as reflected in the following text exchange from September 29, 2021, which may be considered an allegation within this paragraph for purposes of Defendants' responsive pleading.



54.    However, most of the repeated texts and calls were of a threatening or menacing nature, as reflected in the following texts, where Palmer repeatedly expresses obsessive and compulsive jealousy regarding Lyons' friendship with Eric Carlson, an officer with Customs and Border Patrol. The texts, which are copied into the following pages of this complaint and may be considered forming a part of this paragraph for purposes of Defendants' responsive pleading, contain a series of menacing phrases such as:

a) "I know who ur talking to"

b) "I both better get ur stories right"

c) "Fuck u. he knew and will get his own"

d) "he will get what he deserves"

e) "Don't care! He will get his own"

f) "I will leave u something! Love u and [Lyons' daughter]. Sorry I hurt u!!"

g)  "I left you 50k."

h) "I left something"

i) "U will never have to worry about me! Left u something"

j)  "Don't matter! U and Eric have kicked into work.  And fuck u both! I'm hurt! And he will get fist in mouth!"

k)  "All good see u in the clouds"

l)   "Left u 50k! Enjoy!"

m) "U two can have ur love after I kick the fuck out of him"

n)  "But u won't have to worry about it! I will take care of that for u! Good love."

o)  "He is going to get a fist"

p)  "I'm out, I will let Eric know. In the am. All good"

q)  "Im fucked up and warned Morgan I might be in because I might do something stupid! But it might not matter."



























55.    As can be seen in these texts, which provide a window into Palmer's state of mind, Palmer became unhinged, irrational, aggressive, and threatening toward Lyons when she tried to leave him.  Palmer repeatedly expressed an obsessive desire to possess Lyons as a romantic companion and wanted to resume the relationship with her.  At times, Palmer would make menacing comments that sounded like he was going to engage in self-harm in order to draw Lyons into communication with him. It bears repeating that Eric Carlson, who Palmer repeatedly threatens with physical violence in these texts, is a federal agent with Customs and Border Patrol.  Palmer was well aware of these facts when he sent the texts to Lyons.

56.    As the texts demonstrate, Lyons was always professional, firm, and courteous with Palmer, telling him that she did not want to be in a romantic relationship with him, and did not want to have any communication with him.  Lyons made every effort to let him down respectfully and not do anything to increase the pain and mental distress Palmer was experiencing.

57.    On October 3 and 4, 2021, Palmer sent the following texts to Lyons:



58.    It is against the backdrop of these last texts that Lyons was confronted by Palmer on October 5, 2021, while on patrol in uniform, as described above in paragraph 12.  Because Palmer's conduct had now risen to a level where it was creating a genuine risk to public safety and Lyons' ability to discharge her job functions, she decided to report the incident to her superiors the next day.

### VI. Lyons reports Palmer's criminal conduct and is terminated by Chief Newton for reporting Palmer's crimes

59.    On October 6, 2021, Lyons reported Palmer to her superiors at the GFPD.  Lyons first called and spoke with Morgan Kasuske (Deputy USM "supervisor") to report what had happened. He indicated Lyons would technically need to go to her specific Sergeant and report it via chain of command. Lyons then texted Sgt Bragg and asked that he meet her early – he agreed.

60.    In the course of her disclosure to Sgt. Bragg, Lyons relayed to him the following:

   a) That she had broken up with Palmer and Palmer was refusing to accept that.

   b) That things were getting progressively worse and escalating since the time Lyons ended the relationship.

c) That since September 24, 2021, Palmer was continuing to send Lyons a number of text messages in a row and would not respect her stated intention to have no contact with him.

d) That Palmer had recently showed up to Lyons' apartment to "give her the rest of my things" and barged his way into her apartment. Lyons asked and begged him multiple times to get out of her home, but he refused to do so. Palmer demanded to see her phone and her conversations with Eric.  Lyons explained to Sgt. Bragg that she reached out to Eric and spoke with him a little bit over text messages, briefly, and that Palmer found out. Lyons told Sgt. Bragg Eric's employer and position on the task force. Lyons explained that Palmer refused to leave her apartment for so long that she eventually got herself and her daughter ready to leave and right as she was walking out the door he finally left her apartment.

e) Lyons told Sgt. Bragg that from that point on, the repeated texts got worse. They were harassing in nature, and Palmer was calling her repeatedly and obsessively.

At one point, Palmer called Lyons 13 times and then 5 times in a row has shown by the following screenshot from her phone, which can be considered a part of this subparagraph for purposes of Defendants' responsive pleading:



f) Lyons told Sgt. Bragg about the incident the day before, October 5, 2021, where Palmer showed up to Town Pump when Lyons checked out for a "quick pit" there. Lyons explained to Sgt. Bragg that Palmer had somehow found her location, either from following her or by using the radio and computer GPS that is provided by the GFPD. Lyons told Sgt. Bragg that Palmer used his work truck to do so. Lyons told Sgt. Bragg that Palmer held the patrol car door open and sat in between the door and her so she couldn't get the door closed, and that she had to deescalate Palmer in order to leave. Lyons explained that she drove back to the station and later went to court. Lyons told Sgt. Bragg that she was very shocked and afraid with what had happened and didn't know what to do.

g) Lyons explained to Sgt. Bragg that, the day she was reporting this to him, she had her mother pick up her daughter up from school and bring her home to her house. Lyons told him from that moment, she began living at her mother's house as she was afraid to be alone at

her own home for fear that Palmer might do something

which would result in injury or harm to her daughter.

h) Lyons told Sgt. Bragg she had went to Eric's house after

work the night of October 5, 2021, to speak with him

about what happened and that Palmer sent both her and

Eric a text message photo of her car outside Eric's house.

The text message is reproduced below and may be

considered a part of this paragraph for purposes of

Defendants' responsive pleading.



i)

    j) Lyons told Sgt. Bragg Eric never told Palmer where he lived and no one in town knew as his address as he was new to Great Falls, thus implying that Palmer had used surveillance resources available to him as an officer of the GFPD to obtain this information. Lyons told Sgt. Bragg at that point she was very afraid and decided she needed to report it and needed help.

    k) Lyons told Sgt. Bragg her entire relationship with Palmer was very bad and that he was afraid he was going to snap and doing something to hurt her.

61. Sgt. Bragg asked Lyons "so is like privacy in communications or something or what do you want out of this?" At that time, all Lyons knew was that she expected to be protected from any such further conduct from Palmer.

62. During this conversation, Lyons was very upset explaining this to Sgt. Bragg. Lyons was crying and shaking, to the point where Sgt. Bragg told her to go take some time and not come back to work until she was ready.

63. Lyons returned to shift that day around 11-1130 am. Lt. Black began speaking with her privately. He stated, "this is not the first time we've

had to deal with something like this from Travis". Lt. Black took down

Lyons' mother's address in case of emergency.  Lyons does not have

any further specifics about prior incidents involving Palmer but intends to

learn about them in the course of discovery in this case.

64.    Lt. Black told Lyons to save all the messages she exchanged with

Palmer and she did so.  However, no one from the GFPD took the time

to ask for them or review them, as if they deliberately did not want to see

their content.

65.    Later, Lyons was asked to come back to the station and did so. At

that time, Lyons met with Capt. Schaffer, Capt. Moccasin, and Lt. Black.

At that time, they discussed the situation, and Capt. Moccasin told Ms.

Lyons she was not to speak with Mr. Palmer.  Ms. Lyons told him that

she did not want to speak with him, which is why she had contacted her

superiors.  Capt. Moccasin replied, "well, when you have a moment of

weakness, don't reach out to him."

66.    At that point, the GFPD allegedly began an administrative

investigation of the matter. In spite of serious and substantial evidence

that Palmer had actually committed crimes of domestic violence against

Lyons, the GFPD allowed Palmer to continue working and did not place

him on leave or in any way restrict his access to firearms, or the surveillance tools available to him as an officer of the GFPD.

67.    At that time, Lyons also spoke with Lt. Munkres and provided him copies of text messages between Palmer and herself.  Lyons also informed Lt. Munkres that Palmer would often push her to the ground, yank on her arms, and other physical abuse. At that time, Lyons related a specific incident that occurred one evening in May of 2021, when Lyons was attempting to grab her daughter and flee from the abuse. Palmer stood over her daughter so she could not access her daughter. Lyons tried to run to the kitchen to get her phone and keys and Palmer took them from her refusing her access to call for help. When Lyons tried to flee out the door, he barricaded her inside his house so she couldn't run out for help. He then got his gun and kept yelling at Lyons that he didn't need to be around if she was going to leave him. He waived the gun around and then eventually stopped waiving it and held on to it. Lyons was able to grab the gun from him and unload it. When Lyons tried to walk back towards his bedroom (where her daughter was) he jumped on her from behind.  Lyons was able to break free and go hide the gun and get her daughter. This was divulged to Lt. Munkres.

68.    Lyons also told Lt. Munkres that on at least 5 or 6 occasions,  Palmer

would pin her down or barricade her when she tried to leave him. Lyons

told Munkres Palmer would throw items at her and push her around and

yell and scream at her.

69.    About two weeks after this initial report, Lt Munkres asked if Lyons

would cooperate with an investigation.  Lyons told him she would, but

was afraid and overwhelmed at what would happen to her if she did. No

further action was taken by the GFPD, and she was never asked for any

further information.

70.    On November 9, 2021, Lyons was taken out of briefing and

terminated. She met with the Chief Jeff Newton, Capt. Otto and John

Marshall. Chief Newton said to Lyons "You're an educated, intelligent,

woman and should have known better. What happened was no body's

fault but your own. It's not my fault, it's not Capt. Otto's fault, and it's not

John Marshalls fault. It no one else fault but your own." Capt. Newton

also said that "I had high hopes for you to be a rising star at this

department and now look."

71.    The termination letter as attached to his complaint as Exhibit A, and it

constitutes clear and convincing evidence of a custom and usage of

pervasive gender bias against women within the GFPD, and victims of

domestic violence, and demonstrates conduct taken under color of law by the GPFD in violation of Lyon's rights to due process and equal protection of the law.

72.    The letter begins by recounting a "physical altercation" between Palmer and Lyons in May of 2021. The letter noted there were "allegations that MPO Palmer had engaged in potentially suicidal ideations and unlawful restraint. Through the series of text messages, obtained from your cell phone, to include correspondence with MPO Palmer's sister, concern existed for MPO Palmer's well-being. Despite your threats to report the behavior of MPO Palmer to a GFPD supervisor, and also U.S. Marshall Kasuske . . . no reports or notifications were actually made."  For this omission, Lyons was found to have violated GFPD Policy, Section 118, Subsection 11 which requires officers to inform their supervisors "of matters which may affect the welfare of the GFPD."

73.    Lyons was also found to have violated Section 118, Subsection 11 on the following basis as well:

> "In reviewing the series of text messages, MPO Palmer had sent text messages in reference to the apparent new relationship you manifested with US Marshall Eric Carlson. MPO Palmer indicated via text message "And he will get a fist in the mouth" and "U two can have ur love after I kick the fuck out him."  MPO Palmer and US

> Marshall Carlson served on the same task force.  The
> volatile nature of your and MPO Palmer's relationship and
> your seeking out and developing a new relationship with
> US Marshall Carlson created obvious animosity and a
> strain on the existing working group.  The implied threats
> towards a Federal Law Enforcement Officer should have
> been reported to MPO Palmer's supervisors and were
> not."

74.    The letter also cited Lyons for violating GFDP Policy, Chapter 4,

Section 400, which describes conduct which is considered "Unbecoming

an Officer."  The alleged conduct giving rise to this violation is described

in the letter as follows:

> "You initiated a personal relationship with US Marshall
> Carlson knowing he and MPO Palmer worked on the
> same task force. This was done despite the toxic behavior
> and relationship between you and MPO Palmer.  You
> apparently first became aware of and interested in US
> Marshall Carlson while assisting on-duty at the scene of a
> traffic stop, then later asked Carlson's supervisor, US
> Marshall Morgan Kasuke for Carlson's phone entirely
> personal reasons, i.e., to initiate a relationship."

75.    Lastly, the letter indicated a probable violation of Chapter 1 Section

114, "Code of Ethics and Oath of Office", based on the following

allegation: "The investigation also indicated the existence of significant

issues occurring outside the workplace which are operational concerns

for the organization.  Although the investigation process could not fully

corroborate all allegations concerning conduct and the inappropriate use

of alcohol, the type of behavior clearly rose to the level of significant

concern in the context of an internal department investigation."

76.   The termination letter failed to address Palmer's conduct, as

described herein, where he likely committed the offenses of stalking,

privacy in communications, and partner family member assault. Nor did

it address the occurrence of October 5, 2021, where Palmer interfered

with Lyons' ability to function while on patrol, creating a risk to public

safety, or the event on October 22, 2021, where Palmer stalked Lyons

while she was on duty performing a traffic stop.

77.   In the letter, Chief Newton blamed Lyons for Palmer's irrational and

violent behavior. The letter shows Chief Newton had knowledge that

Palmer had threatened violence against a federal agent, yet Chief

Newton did not report the conduct to the appropriate state and federal

authorities.

78.   Chief Newton's letter is action carried out under "color of law," on

official GFPD letterhead with the full force of law, and is *prima facia*

evidence of the custom and usage of gender bias against women

officers and victims of domestic violence on the GFPD, and

demonstrates that Lyons termination was done without due process or

equal protection of the law.

79.   Chief Newton's letter was spiteful, reckless, fraudulent, and intentionally calculated to cause Lyons' severe emotional distress, which it did.

80.   Chief Newton's letter also recklessly provided cover for the probable criminal activities of Palmer, placing Lyons and her daughter in risk and peril.

81.   By covering for Palmer and giving him access to the surveillance tools and powers of a GFPD officer, Newton created an unreasonably dangerous condition for Lyons and her daughter and showed careless and wanton disregard for the law.

82.   As a result of the unlawful conduct described in this complain, Lyons suffered the loss of her job, and severe emotional distress. The Defendants are liable for these damages.

## VII. Count I- Violation of 42 U.S.C. § 1983 (Denial of equal protection and due process of law)

83.   The foregoing paragraphs are realleged as though set forth in full.

84.   "To sustain an action under § 1983, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional right." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699-700 (9th Cir. 1988).

85.    Montana statutes that protect victims of domestic violence particularly recognize that persons such as Lyons are entitled to heightened protection based their status as victims of domestic violence. *Massee v. Thompson*, 2004 MT 121, ¶¶ 43-44.

86.    By terminating Lyons and failing to protect her from Palmer's acts of domestic violence, the Defendants denied Lyons the equal protection of the laws and caused her damage and harm. *Balisteri*, 901 F.2d at 701 ("police failure to respond to complaints lodged by women in domestic violence cases may violate equal protection."). This action occurred under color of state law through Newton's official conduct as Chief of the GFPD.

87.    "There is, in general, no constitutional duty of state officials to protect members of the public at large from crime. But 'such a duty may arise by virtue of a 'special relationship' between state officials and a particular member of the public. A 'special relationship' may exist where: (1) the state has "created or assumed a custodial relationship toward the plaintiff"; (2) the state "affirmatively placed the plaintiff in a position of danger"; (3) the state "was aware of a specific risk of harm to the plaintiff"; (4) or the state 'affirmatively committed itself to the protection of the plaintiff.'" *Balisteri*, 901 F.2d at 699-700.

88.    Chief Newton and the GFPD have condoned and ratified the criminal

conduct of Palmer by firing Lyons and failing to do anything to protect

her. The moving force behind Chief Newton and the GFPD's action was

to punish the *reporting* of criminal activity by Officer Palmer, while

rewarding the criminal conduct itself.  Chief Newton and the GFPD

increased the danger to Lyons and her child by allowing Palmer to

remain on active patrol, with full access to the surveillance tools and

other resources of the GFPD.  *See Ketchum v. County of Alameda*, 811

F.2d 1243, 1247 (9th Cir. 1987) ("In defining this 'special relationship,'

courts have considered whether there is a custodial relationship created

or assumed by the state, whether the state is aware of a specific risk of

harm to the plaintiff, or whether the state has affirmatively placed the

plaintiff in a position of danger. . .").

89.    A "special relationship" has therefore been formed between Lyons

and the Defendants in this case.  The acts and omissions by the

Defendants described herein constitute a denial of due process of law

committed under color of state law against Lyons and have caused her

damages for which they are liable.

### VIII. Count II- Negligence and Negligent Supervision

90.    The foregoing paragraphs are realleged as though set forth in full.

91.    Montana's statutes regarding domestic violence were written

specifically to protect domestic abuse victims, a class of which Lyons is

a member.  *Massee v. Thompson*, 2004 MT 121, ¶¶ 43-44.

92.    GFPD owed Lyons "a legal duty to exercise the same care that a

reasonable officer with similar skill, training, and experience would under

the same or similar circumstances." *Basset v. Lamantia*, 2018 MT 119, ¶

2.

93.    Defendants breached that duty in their termination of Lyons and

handling of the criminal conduct of Palmer as described herein.

94.    This breach of duty caused Lyons damages for which Defendants are

liable.

### IX. Intentional or Negligent infliction of emotional distress

95.    The foregoing paragraphs are realleged as though set forth in full.

96.    Lyons suffered severe or serious emotional distress as the

reasonably forseeable consequence of Palmers and Newton's acts and

omissions.

97.    These defendants are liable to Lyons for damages due to negligent or

intentional infliction of emotional distress.

### X. Punitive damages

98.    The foregoing paragraphs are realleged as though set forth in full.

99.    Newton and Palmer acted with implied or actual malice in the commission of the torts described in this complaint as that term is defined under Montana law.

100.  These defendants acted with reckless indifference to the high probability of injury to Lyons in their conduct.

101.  Exemplary damages should be imposed upon these defendants to punish their intentional wrongdoing and deter them from similar conduct in the future.

## XI. Class Certification

102.  The foregoing paragraphs are realleged as though set forth in full.

103.  Lyons seeks certification as a class representative pursuant to F.R.Civ. P. 23(a) on behalf of all victims of domestic violence subject to the jurisdiction of the GFPD, who have in the past been denied equal protection of the law, or who may be denied equal protection in the future due to the customs and usages of the GFPD with regard to victims of domestic violence as described in this complaint.

104.  Lyons seeks injunctive relief on behalf of said class members to restrain and enjoin the present customs and usages of the GFPD, so that the policing practices and policies of the GFPD do not operate to deny these class members the equal protection of the laws.

105.  The questions of fact and law concerning the unequal application of the law to these said class members predominate over any question affecting their individual circumstances as victims of domestic violence.

106.  A class action is superior to any other available means for fairly and efficiently adjudicating the controversy because such practices can only be addressed by restraining and enjoining practices that have department-wide application on a case-by-case basis.  By certifying Lyons as a representative of such members, she may seek relief on their behalf which will ensure that the widespread and pervasive denial of equal protection of the law is ended.

107.  Upon information and belief, Lyons alleges that what happened to her is emblematic of a larger, systematic policing problem within the GFPD. Lyons has personally witnessed the actions and reactions of officers within the GFPD and alleged victims of domestic violence who have been contacted by the GFPD, which give her a reasonable belief that denial of equal protection of the laws occurs on a frequenting and continuing basis to victims contacted by the GFPD.

108.  Lyons has a good faith belief that discovery into the history of reports of domestic violence to the GFPD, the attitudes, conduct, and communications of GFPD officers, as well as interviews with alleged

victims describing how their cases were handled by the GFDP, will

demonstrate a wide-spread and systematic denial of equal protection to

these class members which can be most effectively alleviated through

class certification and agency-wide injunctive relief. *See e.g., Rios-Diaz*

*v. Butler*, CV-13-77-BU-DLC-CSO (D. Mont, Missoula Division, April 3,

2015, ECF Doc. 39) (granting class action injunctive relief against

Montana Highway Patrol to stop agency-wide violations of class

members' Fourth Amendment rights).

109.  The "numerosity" requirement of Rule 23(a) is satisfied due to the

large probable numbers of victims of domestic violence, or future victims

of said domestic violence, within the municipal jurisdiction of Great Falls,

Montana.

110.  The "commonality" requirement of Rule 23(a) is satisfied because all

victims of domestic violence are treated as a common class under

Montana state law. *Massee v. Thompson*, 2004 MT 121, ¶¶ 43-44.

111.  The "typicality" requirement of Rule 23(a) is satisfied because the

injury inflicted on Lyons is precisely the type of injury that has been

inflicted on other members of the proposed class.

112.  The "adequacy of representation" requirement of Rule 23(a) is

satisfied because Lyons herself is a member of the class she seeks to

represent. Furthermore, lead counsel in this case, Brian Miller, served

as counsel in *Rios-Diaz*, wherein similar relief to that sought in this case

was obtained.

113. Since much of the information necessary to obtain certification of this

class is held by Defendants, after an appropriate period of discovery as

determined by the Court, Lyons intends to move for certification of this

class pursuant to F.R.Civ.P. 23(a), and then seek injunctive relief on

their behalf as permitted under F.R.Civ.P. 65.

## X. Injunctive Relief

114. The foregoing paragraphs are realleged as though set forth in full.

115. F.R.Civ.P. 65(a)  and (b) permit Lyons to see a preliminary injunction

restraining Palmer and Newton from causing her ongoing harm, and to

maintaining the status quo regarding her physical safety and that of her

daughter.

116. Concurrently, with this complaint, Lyons is filing a motion and brief for

a temporary restraining order, preliminary injunction, and show cause

hearing seeking the following relief:

a) Restraining Palmer from coming within 1500' feet of

Lyons and her daughter;

b) Restraining Palmer from contacting, communicating, or monitoring Lyons in any way, shape or form;

c) Restraining Palmer from access to any firearms;

d) Restraining Newton from allowing Palmer to remain on active duty with access to firearms, surveillance equipment and resources, and placing him on administrative leave pending further order of this Court.

117. Upon class certification under F.R.Civ. P. 23(a), Lyons intends to seek class-wide relief against the GFPD on an agency-wide level to ensure that no class members are denied equal protection of the laws.

WHEREFORE, Plaintiff Lyons prays for the following relief:

1. A jury trial on all issues so triable;

2. Injunctive and appropriate equitable relief from the Court;

3. Certification of class representation after an appropriate period of discovery;

4. Compensatory damages as allowed by law;

5. Punitive damages as allowed by law;

6. Attorney fees and costs as allowed by law; and

7. Any other relief this Court deems necessary and just.

Dated this 6th date of December, 2021

/s/ Brian J. Miller

Brian J. Miller
Anne Sherwood
Morrison, Sherwood, Wilson, and Deola, PLLP
*Attorneys for Plaintiffs*

## VERIFICATION

State of Montana        )
                              :ss
County of Cascade          )

I am the Plaintiff in the foregoing proceeding. I have read the foregoing Complaint. The facts and matters contained therein are true, correct and complete to the best of my knowledge and belief. The documents embedded in the complaint are true and correct copies of the documents they purport to be.



_____
MCKENZIE LYONS

SUBSCRIBED AND SWORN TO before me by MCKENZIE LYONS this 6th day of ___December___, 2021.


_____ (signature)


NIKKI PFRIMMER
NOTARY PUBLIC for the
State of Montana
SEAL   Residing at Sand Coulee  Montana
My Commission Expires
March 24  2023

*Verified Complaint and Demand for Jury Trial and Injunctive Relief*            61